KAREN A. OVERSTREET
Chief Bankruptcy Judge
United States Courthouse
700 Stewart St., Suite 6310
Seattle, WA  98101
206-370-5330

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| In re<br><br>CHERYL SCHEMBRIE,<br><br>        Debtor.<br>_____<br><br>VLC ONE, LLC,<br><br>        Plaintiff.<br><br>V.<br><br>CHERYL SCHEMBRIE,<br><br>        Defendant.<br>_____ | Chapter 7<br><br>Bankruptcy No. 06-11840<br><br>Adversary No. 06-1292<br><br>**MEMORANDUM DECISION**<br><br>**[NOT FOR PUBLICATION]** |

This matter came before the Court for trial on May 17, 2007 on the complaint of VLC One, LLC ("VLC") for unpaid rent and other amounts due under a commercial lease between VLC and the Monogram Shop, Inc. ("Monogram"), which lease was guaranteed by the debtor, Cheryl Schembrie. The Court considered the evidence presented, the exhibits admitted, the testimony of the witnesses, and the argument of counsel. The parties filed post-trial supplemental briefs on May 21 and May 22, 2007, and the Court has also considered those submissions.

MEMORANDUM DECISION - 1

Based upon the evidence in the record, the Court makes the following findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.[1]

## I. FINDINGS OF FACT

Monogram, a corporation wholly-owned by Ms. Schembrie, entered into a five-year commercial lease agreement with WAPO Investment, LLC ("WAPO") commencing on September 1, 2000 and terminating on August 31, 2005 (the "Lease"). Ex. 9. Pursuant to the terms of the Lease, Monogram leased Suite K of the Appletree Plaza, a commercial property with a number of other tenants. The Lease reserved to the landlord the right to unilaterally terminate the lease and tenancy in the event of the tenant's default. Ex. 9, Lease, ¶14.2.1. The Lease further provided that the tenant would remain liable for all rents and damages sustained prior to termination as well as post-termination damages in an amount equal to rents which would have accrued but for the termination. *Id.* at ¶14.3. Ms. Schembrie signed an unconditional personal guaranty of the Lease. Ex. 10.

In the spring of 2003, WAPO sold the property and assigned the Lease to VLC. As a condition of VLC's purchase, the tenants of the property, including Monogram, were required to execute estoppel certificates confirming that WAPO was not in default of its obligations under the Lease as of the transfer date. Ms. Schembrie executed an estoppel certificate on behalf of Monogram. Ex. 20. The estoppel certificate affirmed that as of April 1, 2003,

---

[1] Unless otherwise indicated, all Code, Chapter, Section and Rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* and to the Federal Rules of Bankruptcy Procedure, Rules 1001 *et seq.*

MEMORANDUM DECISION - 2

Monogram had no claims, offsets or defenses under the Lease and that WAPO had no unperformed obligations under the Lease. *Id*. para. (f), (j).

Monogram had a history of late and delinquent payments under the Lease. Exhibit 11 is the first in a series of default letters sent by WAPO and then VLC in response to Monogram's payment defaults. As of the time VLC purchased the Appletree Plaza, Monogram was delinquent under the Lease. In April 2003, pursuant to Exhibit 22, VLC accepted $10,000 from Monogram in satisfaction of all amounts due under the Lease through March 31, 2003, and VLC waived the remaining outstanding balance.

Daniel Gerbitz, the manager of Pioneer Management Company ("Pioneer"), testified on behalf of VLC. Mr. Gerbitz was responsible for managing Appletree Plaza pursuant to a management agreement between VLC and Pioneer. Mr. Gerbitz testified that Monogram frequently became delinquent in the payment of the rent, but would pay the delinquent amounts after notice of default, and in some cases, delivery of a three-day notice to pay or vacate under RCW 59.12.030(3). *See* Exs. 11-19; 22, 23, 24-26 (notices of default and to vacate).

Monogram was in the business of designing and embroidering corporate logos and other designs on clothing and apparel. Monogram used four large industrial sewing machines in order to mass-produce embroidered apparel for commercial sale.

On Sunday, February 29, 2004, Mr. Gerbitz was called to Appletree Plaza by a tenant who advised him of a water leak originating in the suite adjacent to Suite K which was leased by another tenant, American Business. The fire department was called

MEMORANDUM DECISION - 3

to turn off the water in order to stop the water leakage. After the American Business space was opened, it was determined that the flooding was caused by a ruptured water heater. Mr. Gerbitz attempted to assess whether there was any leakage into Monogram's space by looking into the windows of Suite K. Because he saw no evidence of flooding, Mr. Gerbitz did not contact Ms. Schembrie that day.

Ms. Schembrie testified that upon her arrival for business on Monday morning, March 1, 2004, she discovered substantial flooding in Monogram's leased space. She described the carpets as "squishy" and testified that boxes of merchandise being stored on the floor of the suite were soaked on the bottom. Ms. Schembrie met with Mr. Gerbitz that day and he told her that she needed to clear all of Monogram's property from the space so that drying and cleaning equipment could be brought in. Ms. Schembrie testified that when they met again the following day, Mr. Gerbitz told her she would need to pay the past due rent or vacate the space within two weeks. Indeed, that day VLC delivered to Monogram a three-day notice to pay or vacate. Ex. 26. The notice recites that Monogram's rent was delinquent for the four-month period commencing December 2003 and through and including March 2004. The notice states:

> You are further notified and required to pay not less than $18,711.25 to the undersigned within three (3) days of the date of service of this notice upon you, or, in the alternative to vacate and surrender said premises.

Mr. Gerbitz's opinion was that less than a quarter of Suite K was affected by the water leak. He testified that the water had risen only about one-half inch in the affected areas of the suite.

MEMORANDUM DECISION - 4

Mr. Gerbitz offered a different version of his conversations with Ms. Schembrie. He contended that he told Ms. Schembrie only that the boxes on the floor of Suite K needed to be moved to a dry area before the suite could be dried and cleaned. He testified that when Ms. Schembrie responded that she could not do that, he suggested she contact Monogram's insurance carrier to pay for Monogram's personal property to be moved. Ms. Schembrie told him Monogram did not have insurance. Mr. Gerbitz regarded Monogram's failure to have insurance as a violation of the Lease and instructed his assistant to prepare Exhibit 26. He denied that he told Ms. Schembrie Monogram had two weeks to vacate the space.

Ms. Schembrie's version of what happened in the week after the flood was more credible than Mr. Gerbitz's version. Ms. Schembrie called David Fife, a friend who was with Ms. Schembrie when Mr. Gerbitz told her she had two weeks to pay the delinquent rent or vacate the premises. Mr. Fife corroborated Ms. Schembrie's account of her meeting with Mr. Gerbitz as well as her description of the water damage. Mr. Fife described water in most of the space and evidence that there had been up to a foot of water in some places. Ms. Schembrie also called Mark Meyer, another tenant at Appletree Plaza, to corroborate her description of the extent of the water damage in Suite K. Mr. Meyer testified that the water was deep enough in the entrance to Suite K that it would cause your "feet to get wet."

After receiving the three-day notice to pay or vacate, Ms. Schembrie took steps to vacate Suite K. On or about March 9, 2004, she signed a Lease Agreement with The Evans Company for space at Evans Industrial Park. Ex. 29. The initial minimum monthly

MEMORANDUM DECISION - 5

rent for the new space was $2,337, approximately $2,000 per month less that what Monogram was paying for Suite K at Appletree Plaza. Ms. Schembrie testified, without providing any specific documentary support, that moving Monogram's business equipment and furnishings cost thousands of dollars. Exhibits 30 and 31 are pictures which show the size of the industrial sewing machines that were moved. Although the exact date that Monogram vacated Suite K cannot be established from the evidence, it appears to have been on or around March 8, 2004.

Mr. Gerbitz testified that VLC incurred significant expenses cleaning up Suite K after Monogram vacated so that it could be re-rented. Exhibit 27 contains invoices dated between March 21, 2004 and June 2004 cataloging expenses totaling $21,027.80. VLC contends that Ms. Schembrie is liable for these costs in addition to unpaid rent reserved by paragraph 6.2 of the Lease, which required Monogram to maintain the leased space in "good condition and appearance," and paragraph 6.4, which required Monogram to surrender the space upon termination of the lease "in good condition and in accordance with Tenant's maintenance obligation and broom clean, ordinary wear and tear excepted." Lease, Ex. 9. Ms. Schembrie denied any responsibility for the repair costs, testifying that she had leased the space for 17 years and that all repair costs were attributable to ordinary wear and tear over that extended period, the flood damage, and VLC's independent decision to fund improvements to the space.

Mr. Gerbitz also testified that after the completion of all of the work on Suite K he contacted a number of potential tenants and listed the space for lease, including listing it on an internet

MEMORANDUM DECISION - 6

site.  VLC agreed to reduce the rent from $15 to $12 per square foot.  According to Mr. Gerbitz, VLC was willing to lease the space "as is" on a month to month basis, but would require a longer term if improvements were requested by a new tenant.  It appears he showed the space to only one prospective tenant, Mark Meyer, who owned another business in Appletree Plaza.  Mr. Meyer testified that he was unwilling to lease Suite K on a long term basis.  He had 13 months left on his existing lease of Suite C in Appletree Plaza and was interested in adding some additional space for the remainder of that term.  Instead, he leased Suite A as additional space.  On cross examination, however, Mr. Meyer clarified that had he rented Suite K he would have expected VLC to allow him to surrender Suite C.

Mr. Gerbitz was unable to re-lease Suite K.  Therefore, VLC claims damages for breach of the Lease in the total amount of triple net rent remaining under the lease to August 31, 2005.  As previously noted, VLC seeks reimbursement for $21,027.80 in repair and construction expenses.

## II. JURISDICTION

The Court has jurisdiction of this matter pursuant to the provisions of 28 U.S.C. §1334(b) and 157(a).  This is a core proceeding under 28 U.S.C. §157(b)(2)(B).  This action was originally filed in King County Superior Court, but was removed by defendant shortly after she filed a chapter 13 petition pursuant to 28 U.S.C. § 1452.  After the removal of this action but prior to trial, the Court converted Ms. Schembrie's chapter 13 case to a chapter 7 case and a trustee was appointed.  The trustee retained Ms. Schembrie's

MEMORANDUM DECISION - 7

counsel in this matter as special counsel to represent the estate's interests at trial.

### III. CONCLUSIONS OF LAW

**A. Defaults Asserted by Defendant.**

In various pleadings, Ms. Schembrie alleged defaults by WAPO under the Lease. The Court ruled orally at the outset of trial, however, that Ms. Schembrie waived any such defaults when she executed the estoppel certificate on behalf of Monogram on April 1, 2003. Ex. 20.

**B. Constructive Eviction.**

Ms. Schembrie contends that the damage to Suite K caused by the water leak along with VLC's failure to repair and restore the premises resulted in constructive eviction and excused Monogram from future obligations under the Lease. Under Washington state law, constructive eviction requires (i) a failure by the landlord to perform a duty; and (ii) a reasonable opportunity to remedy the problem. In this case, Monogram did not give VLC an opportunity to remedy the problem but VLC also elected to pursue eviction of Monogram through unlawful detainer proceedings.

On March 2, 2004, just two days after the leak occurred, VLC delivered to Monogram a notice to pay rent or vacate the property. Ex. 26. That notice stated that as of that date, Monogram was delinquent in the payment of $18,711.25 for the four-month period ending March 31,2004. In response to the notice, Ms. Schembrie located another leased space for Monogram's business and vacated Suite K.

The Court concludes based upon these facts that Monogram vacated Suite K at Appletree Plaza because it was unable to pay the

MEMORANDUM DECISION - 8

delinquent rent demanded by VLC not because it was constructively evicted. There is no evidence that after the water leak Ms. Schembrie gave any kind of notice to the landlord that it was responsible for remedying the water damage, nor did she give VLC an opportunity to remedy the problem. Accordingly, the Court finds in favor of VLC on defendant's constructive eviction claim.

**C. The Rent Cap Under 11 U.S.C. §502(b)(6).**

Section 502(b)(6) of the Bankruptcy Code limits a lessor-creditor's claim for damages arising from the termination of a real property lease. Specifically, a landlord's claim in bankruptcy is limited to rents reserved under the lease for one year following the earlier of the filing of the debtor's bankruptcy petition and the date on which the lessor repossessed the property or the lessee surrendered the leased property, plus any unpaid rent due under the lease on the earlier of such dates. 11 U.S.C. §502(b)(6)(A) and (B). Monogram vacated Appletree Plaza around March 8, 2004, approximately 18 months prior to the expiration of the Lease term.

Neither party disputes that as of the end of March 2004, delinquent rent and other amounts due under the Lease totaled $18,711.25. Ex. 26. The parties, however, contest the landlord's entitlement to future rent accruing under the Lease from and after April 2004. VLC argues that because neither surrender nor repossession occurred prior to June 9, 2006, when Ms. Schembrie filed her chapter 13 petition, the petition date governs the rent cap for purposes of the allowance of VLC's claim. Using the petition date, all of the damages asserted by VLC would constitute prepetition damages allowable in full in the bankruptcy.

MEMORANDUM DECISION - 9

By contrast, Ms. Schembrie argues that Suite K was either surrendered or repossessed in March of 2004 and that VLC's claim is therefore limited to rent accruing under the Lease from April 2004 to March 31, 2005. The Lease would have expired by its own terms on August 31, 2005, prior to the petition date.

The Code does not define "surrender" or "repossession" for purposes of Section 502(b). The Court finds that state law should govern the interpretation of these terms. *See In re Lomax*, 194 B.R. 862, 865-66 (9th Cir. BAP 1996)(applying California law to determine whether surrender/termination had occurred under §502(b)(6)), *In re McSheridan*, 184 B.R. 91 (9th Cir. BAP 1995)(citing *In Re Iron Oak Supply*, 169 B.R. 414, 415 (Bankr. E.D.Cal. 1994)). The Lease is governed by Washington state law, therefore the Court looks to that law to interpret these terms.

**D. Surrender and Repossession Under Washington Law.**

Washington recognizes three ways in which a lease may be terminated by repossession or surrender: (1) surrender by mutual agreement of the parties, (2) surrender by operation of law, and (3) repossession pursuant to a statutory "unlawful detainer" proceeding. The third method is at issue here.

VLC argues that repossession can be achieved only through completion of the unlawful detainer proceeding. VLC's position presumes that a possessory interest can never be reestablished via self-help or by agreement of the parties. However, the Ninth Circuit Bankruptcy Appellate Panel has held that repossession does not depend on the filing of an unlawful detainer action. *In re Lomax, supra* at 866-67. In *Lomax*, the court noted that "it would be useless to require a landlord to undertake an action for

MEMORANDUM DECISION - 10

unlawful detainer after the premises have been abandoned. Thus, where the tenant has surrendered premises before the proceeding is commenced, there can be no unlawful detainer." *Id.* at 867 (citing 4 Witkin § 686). The sole issue in an unlawful detainer action, after determining that a landlord-tenant relationship exists, is the question of who has the right to possession. CJS LANDLORD § 1362. Serving a tenant with notice to pay rent or vacate the premises is the first step in the process. RCW Chapter 59.12 requires that, before seeking summary eviction, a landlord must notify a tenant of any delinquency in rent and allow the tenant three days to cure the delinquency or vacate the property. The statute provides a mandatory, cost-efficient alternative to litigation whereby the lessor offers to repossess the property and invites the lessee to accept by performance – in this case, by surrender. However, as a point of law, a tenant cannot achieve the status of "unlawful detainer" unless the notice period has expired and the tenant has neither cured the default nor vacated. Here, the notice period did expire without cure, but Monogram complied with VLC's demand to vacate the property, alleviating any need for VLC to move forward with the unlawful detainer proceedings pursuant to RCWA 52.12.070 et seq.

The Court agrees with the *Lomax* court's reasoning and concludes that an unlawful detainer proceeding was rendered superfluous here when Monogram vacated the premises in response to Exhibit 26.

Subsequent to Monogram's departure from Suite K, VLC reentered the premises, made repairs and improvements, and offered the space for lease to a third party. While not dispositive of surrender,

MEMORANDUM DECISION - 11

reentry and attempts to re-rent the property are consistent with the notion of repossession. A landlord who intends to grant the rights of use and possession to a 3rd party has clearly announced its intention to foreclose on the former tenant's right of resumption.

Relying on *In re Iron-Oak Supply Corp., supra*, VLC argues that applying the cap in this case penalizes VLC for diligently pursuing its rights under the Lease; had VLC ignored Monogram's defaults and took no action to repossess the property, it could have asserted a claim in Ms. Schembrie's bankruptcy unburdened by the rent cap in Section 502(b)(6)(A). In *Iron-Oak*, the debtor notified the landlord that it was abandoning the lease and would no longer pay rent. The court in that case found that the landlord declined to accept "surrender" of the property as that term was interpreted under California law. Because no surrender occurred prior to the petition date, which was six months after the debtor abandoned the property, the landlord was allowed to recover future rent reserved under the lease based upon the petition date as the trigger date under Section 502(b)(6)(A). In *Iron-Oak*, the debtor does not appear to have been in default prior to the time it abandoned the property thus the landlord had no reason to evict or repossess the property. The landlord in that case made a choice to decline the debtor's surrender. In this case, VLC made a choice to evict a tenant who was not paying rent. Whether that resulted in a "penalty" by the application of Section 502(b)(6)(A) is not for this Court to say. The plain meaning of the statute supports the application of the rent cap where the landlord has repossessed the leased property prior to the petition date.

MEMORANDUM DECISION - 12

**E. Mitigation of Damages.**

Ms. Schembrie contends that VLC's damages should be further reduced because VLC failed to mitigate its damages as required by Washington state law. Under Washington law, when a tenant vacates property, the landlord is entitled to recover the rent that would be due for the remainder of the lease term, less the amount actually received by the landlord from subsequent tenants during that time, so long as the landlord makes an honest and reasonable attempt to re-let the property. *See, Crown Plaza Corporation v. Synapse Software Systems, Inc.*, 87 Wn. App. 495, 503, 962 P.2d 824 (1997) (quoting *Exeter Co. v. Samuel Martin, Ltd.*, 5 Wash.2d 244, 249, 105 P.2d 83 (1940)). Ms. Schembrie bears the burden of proving that VLC's efforts to find a new tenant were not reasonable. *Max L. Wells Trust by Horning v. Grand Cent. Sauna and Hot Tub Co. of Seattle*, 62 Wn.App. 593, 815 P.2d 284 (1991).

Whether a landlord has exercised reasonable efforts to re-let property is a question of fact and depends upon the circumstances of the case. Courts have considered various factors in determining the reasonableness of a landlord's efforts, including the scope of the landlord's advertising efforts, whether the landlord retained a real estate agent, and whether the landlord showed the property to prospective tenants. *See, e.g., Pomeranz v. McDonald's Corp.*, 821 P.2d 843 (Colo. Ct. App. 1993)(commercial landlord failed to mitigate damages arising from tenant's breach of lease, where despite poor rental market for commercial real estate, landlord neither placed ad in newspaper, listed property with real estate agent, nor placed sign on property); *Rokalor, Inc. v. Connecticut Eating Enterprises, Inc.*, 18 Conn. App. 384, 558 A.2d 265

MEMORANDUM DECISION - 13

(1989)(landlord failed to mitigate its damages where landlord did not hire a real estate broker until almost four months after the tenant's default and introduced no evidence of the broker's efforts to lease premises). Some courts have examined a landlord's unwillingness to re-let to a possible replacement tenant, re-letting under different terms, or failing to repair or maintain the property in a manner consistent with improving its marketability. *See, e.g., Bert Bidwell Inv. Corp. v. LaSalle and Schiffer, P.C.*, 797 P.2d 811 (Colo. Ct. App. 1990) (landlord failed to mitigate damages after tenants vacated and stopped paying rent, by unreasonably refusing to consent to lease assignment solely because landlord personally disliked proposed assignee). *American Nat. Bank and Trust Co. of Chicago v. Hoyne Industries, Inc.*, 966 F.2d 1456 (7th Cir. 1992) (unpublished table disposition denying motion for summary judgment based solely on grounds that newly advertised rent was higher than previous tenant).

In this case, VLC exercised reasonable efforts to re-let Suite K. VLC employed its property manager, Pioneer, to solicit potential tenants and list the property for lease. Pioneer actually did take steps to market the property and showed the property to at least one potential tenant. VLC undertook to not only maintain but improve the property in an effort to obtain a new tenant. In addition, VLC complied with its contractual duties under the Lease. Paragraph 14.4 of the Lease reads:

> If landlord elects to terminate this Lease following the default of Tenant, Landlord may re-let the Premises…for such term or terms (which may be greater or less than the period which otherwise would have constituted the balance of the Term) and on such terms and conditions (which may include

MEMORANDUM DECISION - 14

> concessions…alterations of the Premises and
> payment of brokers) as Landlord, in its sole
> discretion, may determine…. The failure or
> refusal of Landlord to re-let the
> Premises…shall not release or affect Tenant's
> liability for damages.

Supported by Mark Meyer's testimony, Ms. Schembrie argues that VLC acted in bad faith by failing to consider him as a tenant for one year. She offers no evidence, however, that this was a commercially unreasonable decision by VLC. In fact, leasing to Mr. Meyer's company would have required VLC to accept surrender of the premises currently being leased by that company. There is no evidence that there would have been a net monetary benefit to VLC had a swap of Suite C for Suite K been consummated.

For the foregoing reasons, the Court finds that VLC made reasonable efforts to mitigate its damages.

**F. Calculation of Damages.**

In *In re McSheridan*, 184 B.R. 91 (9th Cir. BAP 1995), the court adopted a three-part test for determining what lease charges are included in "rent reserved" under the lease for purposes of Section 502(b)(6)(A). The court also held that the landlord's additional claims for damages due to the tenant's failure to leave the property in good condition and the landlord's legal fees incurred in connection with the breach of the lease could not be allowed as separate claims in addition to the amount of rent reserved under the lease.

The Court finds that VLC's damages are limited to one year's basic rent, common area maintenance charges, and late fees from April 2004 through March 2005. Those amounts total $77,131.67 calculated as follows:

MEMORANDUM DECISION - 15

```
 1      4/04 - 8/04: $3,800 (basic rent) + $698 (CAM) = $22,490
        9/04 - 3/05: $4,037.50 (basic rent) + $698 (CAM) = $33,148.50
 2      Subtotal: $55,638.50
        Late fee of 5% = $2,781.92
 3      Subtotal: $58,420.42
        Plus $18,711.25 (due under 502(b)(6)(B))
 4      Grand Total: $77,131.67
```

**CONCLUSION**

For the foregoing reasons, the Court will allow VLC's unsecured claim in the amount of $77,131.67. Counsel for Ms. Schembrie is instructed to submit an order in conformance with this ruling.

DATED this 29th day of June, 2007.

_____
KAREN A. OVERSTREET
UNITED STATES BANKRUPTCY JUDGE

MEMORANDUM DECISION - 16